**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| VALERY VINAROV, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 05 C 2063 |
| MOTOROLA, INC., | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| Defendant. | ) | |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Valery Vinarov ("Vinarov") had been working for Defendant Motorola, Inc.

("Motorola") for eight years when he was terminated, allegedly due to Motorola's poor business

performance.  In filing this lawsuit Vinarov claims Motorola discriminated against him because of

his age, national origin, and religion.  Vinarov also contends that he is owed overtime pay Motorola

failed to pay him from 1995 to 1999 and that Motorola was unjustly enriched when it failed to pay

him for work that he did on a project that he alleges was outside the scope of his original job duties.

Both Motorola and Vinarov move the Court for summary judgment, pursuant to Federal Rule of

Civil Procedure 56(c); Motorola seeks summary judgment as to all counts of Vinerov's Second

Amended Complaint and Vinerov seeks summary judgment as to only Count I, alleging age

discrimination.  For the following reasons, the Court denies both motions for summary judgment

as to Count I and grants Motorola's motion as to Counts II-IV.

In response to Vinarov's motion for summary judgment, Motorola also filed a motion for

Rule 11 sanctions, submitting that Vinarov improperly argues that the production of evidence of

discrimination compels judgment in his favor as a matter of law. The Court agrees that Vinarov's

motion is without merit, but the Court declines to award sanctions. The arguments that Motorola made in response to Vinarov's motion were those it raised in its own motion. Accordingly, sanctions are not appropriate. Vinarov additionally requested leave to file an amended declaration in opposition to Motorola's motion for summary judgment. For reasons addressed below, this motion is moot.

## BACKGROUND

Vinarov is Jewish and though born in Ukraine, he considers himself of Russian national origin.[1] At age 46, in March 1995, Motorola hired Vinarov to be Project Manager in its Universal Network Operations group.[2] At that time Vinarov entered into an employment agreement with Motorola which provided, in part,

> In consideration of my employment, or continued employment by Motorola, Inc. or its subsidiaries (referred to separately or together as "Motorola") and the salary or wages paid to me, I understand and agree to the following provisions for protection of Motorola property rights:
>
> > 4. To assign and I hereby assign to Motorola as its exclusive property the entire right, title and interest in all my inventions, innovations, or ideas developed or conceived by me solely, or jointly with others, at any time during the term of my employment and which inventions, innovations, or ideas relate to the actual or anticipated business activities of Motorola, or result from, or are suggested by, work which I do for Motorola.
> >
> > 5. To make and maintain written records of all inventions, innovations, or ideas referred to in paragraph 4 above and to submit promptly such records, and supplemental oral disclosures, to designated representatives of Motorola.
>
> ***

---

[1] Citations to the record are in the following form: Plaintiff's Response to Defendants' LR 56.1(a) Statement is cited as PR ¶ ____ ; Defendant's Response to Plaintiff's LR 56.1(a) Statement is cited as DR ¶; Plaintiff's Amended LR 56.1(b)(3)(C) Statement of Additional Facts is cited as PSOAF ¶ ___; Plaintiff's Response to Defendant's Statement of Additional Facts as to Count I is cited as PRDSAF ¶ ___; PR ¶¶ 65-66.

[2] PR ¶15.

This agreement may not be modified except in writing with approval of an officer of Motorola.[3]

In 1997, Vinarov began managing a project in the Code Division Multiple Access business unit under Keith Ten Brook ("Ten Brook").[4] From 1996 to 2003, with the exception of a few brief periods of time, Vinarov worked as a Project Manager under Ten Brook's general supervision.[5] Throughout that time, Vinarov received grade-level promotions, moving from level E09 to E12 by 1999.[6] In both 1999 and in 2001 NAT underwent cutbacks resulting in two reductions in force, or what Motorola calls their Involuntary Severance Program ("ISP"), but Vinarov was not selected for either.

From 1999 through 2004, employees and managers participated in what was called a Personal Commitment ("PC") process to gauge employees' performances and facilitate communication between employees and managers.[7] Pursuant to the PC process, employees also reviewed themselves in quarterly "checkpoints" to assess progress and goals.[8] As part of that program, employees self-assessed their performance and their managers rated them for the review year.[9] The PC documents described specific assignments, goals, and expectations for each

---

[3]PR ¶16.

[4]PR ¶17.

[5]*Id.*

[6]PR ¶19.

[7]PR ¶9.

[8]PR ¶¶ 9, 10.

[9]*Id.*

employee.[10] Through this program Vinarov received several evaluations from Ten Brook and other co-workers.

In 2001, Ten Brook rated Vinarov "meets expectation" and at the end of the review year Ten Brook noted that Vinarov required "additional work" and instructed Vinarov to read and implement recommendations from a book about effective management.[11]  In this same evaluation Ten Brook stated that Vinarov was "strongly driven" but could "improve his effectiveness with improved listening" and attention to detail.[12]  In March 2002, Brian Hughes ("Hughes"), Vinarov's co-worker, provided feedback regarding Vinerov's performance for that year.[13]  Hughes' report stated Vinarov needed to improve his rapport building skills with individuals because he had an aggressive personality.[14]  Hughes noted that Vinerov should work on getting co-operative agreement as opposed to forcing agendas.[15]  Following this "checkpoint," Vinerov had an action plan for the remainder of the year, which consisted of listening without interruption and seeking to understand before being understood.[16]

In what appears to be Vinerov's next checkpoint evaluation, signed by Vinerov and Ten Brook on July 9, 2002, Hughes stated that Vinerov was no longer in the "needs improvement"

---

[10]Deposition of Keith Ten Brook, September 26, 2006, p. 24, Appendix to Plaintiff's Motion for Summary Judgment, Tab D.

[11]PR  ¶ 23.

[12]PR ¶24.

[13]PR ¶40.

[14]*Id.*

[15]*Id.*

[16]PR ¶41.

status.[17]  The next evaluation, signed by Vinerov and Ten Brook on October 7, 2002, Hughes again stated with respect to "Behavior 1" Vinarov was "demonstrating" and no longer in the "needs improvement" status.[18]  Another co-worker, Yuda Luz ("Luz"), also provided feedback that Vinerov was doing his job "the best way, with focusing on the opportunities for [her] team and others."[19]

In 2002, Ten Brook became Senior Director of Motorola's Networks Advanced Technologies organization ("NAT").   At this time Ten Brook was responsible for conducting performance evaluations for employees who reported to him and he selected employees to separate pursuant to the ISPs.[20]  Sometime between August and September of 2002, in a meeting with several Motorola managers, including Ten Brook, Vinarov and another Project Manager, Gary Jackson, were selected to be terminated pursuant to an ISP.[21]  Vinarov's exit date was scheduled for September 2002 but in November 2002, because of work available in another group, Ten Brook transferred Vinarov to a new division to work under Renganath Puranik ("Puranik").[22]  From November to March 2003, Vinarov worked under Puranik's supervision, the purpose of which was to see if Vinarov could work in some other part of the organization.[23]

On November 19, 2002, Motorola held a Relative Performance Assessment meeting where

---

[17]Appendix to Plaintiff's Motion for Summary Judgment, Tab B.

[18]Appendix to Plaintiff's Motion for Summary Judgment, Tab B.

[19]*Id.*

[20]Declaration of Keith Ten Brook, April 25, 2007, ¶ 2, Appendix to Defendant's Motion for Summary Judgment, Tab D.

[21]PR ¶ 33; DR ¶ 17; Deposition of Keith Ten Brook, September 26, 2006, Appendix to Plaintiff's Motion for Summary Judgment, Tab D.

[22]Deposition of Renganath Puranik, October 19, 2006, p. 32, Appendix to Plaintiff's Motion for Summary Judgment, Tab P.

[23]*Id.* at 24.

approximately 18 managers participated and rated Vinarov.[24]  Vinarov received a rating of "least

effective."[25]  At Vinarov's annual performance review, on January 10, 2003, Ten Brook informed

Vinarov of his rating of "least effective."[26]  At this time, Ten Brook also officially notified Vinarov

that he was placed on the list for participation in the ISP.[27]  Motorola's position was that it

terminated Vinarov because the company was experiencing financial losses that required

downsizing, specifically for the year 2002.[28] Ten Brook also told Vinarov he was terminated, not

because of poor results or a lack of accomplishments, but due to his behavior.[29]  Vinarov disputed

this assessment and requested that Ten Brook further explain his evaluation.  Approximately two

weeks later Ten Brook provided Vinarov with more detail, stating that the behaviors at issue were

Vinarov's ability to manage meetings, work effectively with team members, and energize people

to achieve project goals.[30]  Vinarov disagreed with his "least effective" rating and solicited feedback

from two colleagues, Luz and Hughes.[31]  Their feedback was included in Vinarov's final evaluation.

On January 14, 2003, Vinarov and his manager at the time, Puranik, signed Vinarov's final

---

[24]PR ¶ 44 (Vinarov disputes this point, only by referencing his deposition testimony where he testified that he did not believe his performance and accomplishments were sufficiently represented by Ten Brook at the meeting).

[25]Appendix to Plaintiff's Motion for Summary Judgment, Tab B.

[26]Appendix to Plaintiff's Motion for Summary Judgment, Tab B, exhibit 25.

[27] Defendant's Response to Charge of Discrimination, ¶ I.B.4, Appendix to Plaintiff's Motion for Summary Judgment, Tab I.

[28]Deposition of Keith Ten Brook, September 26, 2006, p. 101, Appendix to Plaintiff's Motion for Summary Judgment, Tab D.

[29]Deposition of Valery Vinarov, August 7, 2006, p. 196, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[30]PR ¶ 49.

[31]PR ¶ 50.

evaluation. This evaluation provided that Vinarov had spoken with his manager and the document reflected their agreement that, in summary, "due to incompetent Program Management, developed schedules were not substantiated...[but Vinarov] was able to successfully resolve all of the above issues, remove 3 month delay and put program on schedule within budget constraints."[32] The January 2003 evaluation also provided that the three behaviors Vinarov was asked to work on were demonstrated.[33] The management comments for this evaluation, however, stated that Vinarov needed to "strengthen his behavior skills in terms of "working more effectively with other team members ... [and] energiz[ing] people around to achieve [sic] project goals."[34] Additional comments were that Vinarov met many predefined goals, but did not consistently meet all performance expectations, minimum job requirements were accomplished but some progress was still needed, and noted that he may require "focused development plans or direction in order to manage either [his] results and/or behaviors."[35] Under the "manager's comments" portion of the evaluation, it was noted that Vinarov needed "improvement in the behavior skills to make an effective impact on work partners and other managers."[36] Finally, a hand-written note by Luz stated Vinarov should be rated "ES," meaning Vinarov exceeded some predefined goals, and another note by Hughes stated that Vinarov deserved a rating of "solidly effective" on his PC for 2002.[37]

---

[32]Appendix to Plaintiff's Motion for Summary Judgment, Tab B.

[33]*Id.*

[34]*Id.*

[35]*Id.*

[36]*Id.*

[37]*Id.*

At age 54, on March 28, 2003, Vinarov was terminated.[38] Certain projects Vinarov had worked on were transferred to other Motorola Project Managers, namely Mark Wallace, Jill Engholm, Sandra Ficke-Bradford, and Alan Zhao.[39] These employees were, at the time, under the age of 40.[40]

In June 2003, Vinerov filed a complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging discriminatory discharge and on February 8, 2005 the EEOC issued Vinerov a right to sue letter.[41] On April 8, 2005 Vinarov filed his initial complaint against Motorola. On December 6, 2006 Vinarov filed his Second Amended Complaint ("Complaint"), at issue in the present motion, alleging the following counts: (1) violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq*.; (2) violation of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, Religious and national origin discrimination; (3) failure to pay overtime; and (4) unjust enrichment.

In support of his Complaint, Vinarov assessed statistical data of employees terminated from Motorola from 2002 to 2003. Vinarov found that 64% of NAT employees fired were over the age of forty, even though NAT employees over forty only made up 39% of its total employees.[42] Vinarov's statistics also showed that 22% of NAT employees over forty were fired while only 8%

---

[38]DR ¶7.

[39]DR ¶ 10; deposition of Valery Vinarov, August 7, 2006, pp. 127-28, Appendix to Plaintiff's Motion for Summary Judgment, Tab C (Motorola disputes this fact noting in their response to Vinarov's Rule 56.1 Statement of Facts that Vinarov has failed to cite any support for his claim that he was replaced by Jill Enghold, Alan Zhao, Mark Wallace or Sandra Ficke-Bradford. The Court notes that Vinarov only testified that specifically Jill Enghold and Alan Zhao took over his projects).

[40]DR ¶ 11.

[41]DR ¶9.

[42]DR ¶ 23 (Motorola disputes these figures arguing Vinarov failed to lay a proper foundation or authenticate the document he cites to support this fact).

of NAT employees under forty were fired.[43] These numbers do not include Motorola employees who "self identified" for reduction in force, meaning those who notified management that they would be receptive to being selected.[44]

Vinarov also noted several comments made by Ten Brook during his employment which he claimed were evidence of discrimination: he referred to Vinarov on at least 20 occasions as an "old fart," he repeatedly referred to Vinarov as a "mad Russian bulldog," and he made derogatory references about Israelis during "come to Jesus" meetings.[45]  The first time Vinarov recalled Ten Brook referring to him as an old fart was when Ten Brook had asked Vinarov to sign an agreement that would transfer certain intellectual properties.[46]  Vinarov refused because he believed they needed special approval before such a transfer could be made.[47]  Ten Brook then allegedly told Vinarov he was an "old stupid fart."[48]  The second time Vinarov remembered Ten Brook calling him an old fart was in December 2001.[49]  Vinarov was to call a "come to Jesus" meeting to review performances of two other co-workers, relating to them being late with certain deliveries.[50] Vinarov

---

[43]DR ¶  24 (Motorola disputes these figures arguing Vinarov failed to lay a proper foundation or authenticate the document he cites to support this fact).

[44]PRDSAF ¶ 3.

[45]DR ¶ ¶ 22, 37, 38 (Motorola disputes how many times Ten Brook actually referred to Vinarov as an "old fart."  Vinarov, in his Rule 56.1 Statement of Facts, claims Ten Brook used this term many times, at least more than 20.  However, Motorola points out that Vinarov, in his deposition, remembered only three specific occasions in which Ten Brook called him an "old fart" and contends that conclusory allegations may not be relied upon for purposes of summary judgment citing *Drake v. Minn. Mining & Mfg. Co.,* 134 F.3d 878, 887 (7th Cir. 1998)).

[46]Deposition of Valery Vinarov, August 7, 2006, p. 32, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[47]*Id.*

[48]*Id.*

[49]*Id.* at 46.

[50]*Id.*

told Ten Brook that he did not believe it was the fault of the two employees but the result of project management activities, of which Ten Brook was personally coordinating.[51] In response to Vinarov's comments, Ten Brook told him that he was a "stupid old fart."[52] The third occasion Vinarov remembered Ten Brook calling him an old fart was in January 2003, after Ten Brook formally informed Vinarov he was selected for the ISP.[53] At that meeting Vinarov disagreed with Ten Brook's assessment of his behavioral issues, listed off many of his accomplishments, and asked Ten Brook to explain why he was chosen for the ISP. According to Vinarov, Ten Brook told him he had no time and that Vinarov, an "old stupid fart," should leave him alone.[54] In his deposition, Ten Brook admitted that he called Vinerov an "old fart" on several occasions, but did not recall specific conversations.[55]

Next, Ten Brook used the words "come to Jesus" to describe certain meetings at Motorola where, in his words, problems with the organization required resolution.[56] Vinarov specifically remembered three occasions when Ten Brook requested "come to Jesus" meetings. Vinarov, another Motorola employee, and Ten Brook attended the first meeting sometime in 1997 or 1998.[57] Ten Brook was upset about Vinorov's hiring of Manny Kahana, an Israeli who spoke with an

---

[51]Deposition of Valery Vinarov, August 7, 2006, p. 47, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[52]*Id.* at 47.

[53]*Id.* at 48.

[54]*Id.* at 49.

[55]Deposition of Keith Ten Brook, September 26, 2006, p. 103, Appendix to Plaintiff's Motion for Summary Judgment, Tab D.

[56]*Id.* at 1145-46.

[57]Deposition of Valery Vinarov, August 7, 2006, pp. 152-55, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

accent.[58]  At this meeting, Ten Brook referred to certain Israeli engineers as "these people," said the problem was one of cultural differences, and told Vinarov not to hire anyone like that again because Motorola was an "all-American company."[59]  Ten Brook instructed Vinerov to schedule the second "come to Jesus" meeting near the end of 2001.[60] That meeting involved several Motorola employees and was requested by Ten Brook because of delays that occurred with certain hardware deliveries.[61] In that meeting Ten Brook again referred to cultural differences, this time with respect to the individuals responsible for the late deliveries.[62] As noted above, Vinarov remembered that the third and final "come to Jesus" meeting occurred in January 2002, which was Vinerov's last PC with Ten Brook.[63] At this meeting, Ten Brook discussed Vinarov's accomplishments and Vinarov's behavior issues.[64]

Finally, Ten Brook referred to Vinarov as a "mad Russian bulldog" on several occasions.[65] Vinarov did not recall specific events when Ten Brook used this term but testified that it was "quite a bit."[66] Vinarov's colleague, Hughes, heard Vinarov himself use the term "mad Russian bulldog,"

---

[58]*Id.*

[59]PR ¶ 76; Deposition of Valery Vinarov, August 7, 2006, pp. 152-55, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[60]Deposition of Valery Vinarov, August 7, 2006, p. 159, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[61]*Id.* at 159-60.

[62]*Id.* at 161.

[63]*Id.* at 164.

[64]*Id.*

[65]*Id.* at 152-64, 172.

[66]PR ¶ 68.

but did not hear Ten Brook use this term.[67]

[67]Deposition of Brian Hughes, October 20, 2006, p. 81, Appendix to Defendant's Motion for Summary Judgment, Tab F.

## STANDARD OF REVIEW

To prevail on a motion for summary judgment under Rule 56, a party must present evidence that demonstrates the absence of a genuine issue of material fact.[68] The party seeking summary judgment must identify the portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes shows an absence of a genuine issue of material fact.[69] The party bearing the burden of proof may not rest on its pleadings but must affirmatively demonstrate, with specific factual allegations, that a genuine issue of material fact requires trial.[70] After a moving party has met its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing that a genuine issue for trial exists.[71] The evidence presented by the non-movant is to be believed and all justifiable references are to be drawn in his or her favor.[72] When a reasonable jury could find for the party opposing the motion, based on the record as a whole, a genuine issue for trial exists.[73] This standard is also applied "with added rigor in employment discrimination cases," where intent and credibility are central issues.[74] But "[t]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving

---

[68]*Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

[69]*See* Fed.R.Civ.P. 56(c)*; see also Celotex Corp.*, 477 U.S. 324.

[70]*Celotex Corp.,* 477 U.S. at 324.

[71]*See Becker v. Tenenbaum-Hill Assoc., Inc.,* 914 F.2d 107, 110 (7th Cir. 1990).

[72]*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

[73]*McCoy v. WGN Continental Broad. Co.,* 957 F.2d 368, 370-71 (7th Cir. 1992).

[74]*Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir. 1993).

party]."[75]

## ANALYSIS

**A.      Counts I & II - Age, Religion, and National Origin Discrimination Claims**

Vinarov contends that his age, religion, and national origin were impermissible motivating factors in Motorola's decision to terminate him, in violation of the ADEA, 29 U.S.C. § 621 *et seq.* and Title VII, 42 U.S.C. § 2000e-2. The ADEA makes it unlawful for an employer "to discharge any individual ... because of such individual's age."[76] Title VII makes it "unlawful ... for an employer to fail to refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."[77] Motorola, however, claims Vinarov was terminated pursuant to a reduction in force due to the financial state of the company. Motorola further claims Vinarov was specifically chosen to be terminated, out of five possible project managers, because of his "least effective" rating. There are two methods Vinarov may use to establish his discrimination claims. The first method requires direct evidence and the second is through the *McDonnell Douglas* burden shifting method. Vinarov attempts to show discrimination through both means only with respect to his age discrimination claim in Count I; Vinarov has set forth no argument for religious and national origin discrimination claims under the indirect method.   As to Counts II-IV, the Court accepts nonmovant Vinarov's version of any disputed facts where it is arguably supported by the record.[78]

---

[75]*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

[76]29 U.S.C. § 623(a)(1).

[77]42 U.S.C. § 2000e-2(a)(1).

[78]*See Anderson,* 477 U.S. at 255.

Under the direct proof method, the burden is on Vinarov to show that age, religious or national origin discrimination, were determining factors in Motorola's decision to terminate him.[79] Vinarov may demonstrate discriminatory intent directly in one of two ways. The first is through direct proof of discriminatory intent, such as an admission by the decisionmaker that Vinarov was fired "because of a forbidden factor."[80] Vinarov does not claim that Motorola made an outright "admission" of discrimination.

Vinarov may also prevail under the direct method of proof through a "mosaic" of circumstantial evidence that points "'directly to a discriminatory reason for the employer's action.'"[81] Circumstantial evidence may be ambiguous statements, suspicious timing, or even behavior directed at other employees in the protected group.[82] Circumstantial evidence may also include evidence that other employees similarly situated were getting better treatment, or evidence that the plaintiff was qualified but passed over in favor of another employee "not having the forbidden characteristic and that the employer's stated reason for the difference in treatment is unworthy of belief, a mere pretext for discrimintion."[83] Essentially, there must be evidence presented that, "if believed by the trier of fact, would prove the fact in question 'without reliance on inference or presumption.'"[84] Remarks may also be direct proof of discriminatory intent but stray

---

[79] *See Hoffman v. MCA, Inc.,* 144 F.3d 1117, 1121 (7th Cir. 1998).

[80] *Sartor v. Spherion Corp.*, 388 F.3d 275, 278 (7th Cir. 2004); *Robin v. Espo Engineering Corp.*, 23 F.Supp.2d 895, 900 (N.D. Ill. 1998).

[81] *See Atanus v. Perry,* 2008 WL 696908, *6 (7th Cir. 2008).

[82] *See Troupe v. May Dept. Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994).

[83] *See Troupe,* 20 F.3d at 737.

[84] *Kemp v. Peake,* 2008 WL 268592, *3 (S.D. Ill.)(*quoting Rogers v. City of Chicago,* 320 F.3d 748, 753 (7th Cir. 2003).

remarks, or isolated comments, are insufficient to establish that a decision to terminate an employee was discriminatory.[85] A particular remark may "provide inference of discrimination when the remark was (1) made by the decision maker; (2) around the time of the decision; and (3) in reference to the adverse employment action."[86] Vinarov must proceed under the indirect method if he cannot present circumstantial evidence sufficient to create an inference of intentional discrimination.

Vinarov's circumstantial evidence of intentional age, religious and national origin discrimination consists of:(1) Ten Brook's multiple "old fart" statements; (2) "come to Jesus" meetings; (3)"mad Russian bulldog" statements; (4) reducing Vinarov's rating to "least effective" and placing him on a list for participation in the ISP; (5) failing to issue him a bonus; (6) failing to pay him overtime; and (7) termination from his position based on behavioral problems. Vinarov, thus, must show that but for his age, religion, and national origin, Motorola would not have fired him.[87]

Vinarov's circumstantial evidence creates an inference of intentional age discrimination but not of religious or national origin discrimination. Ten Brook admits that he made the occasional remark that Vinarov was an "old fart" and there is no dispute that Ten Brook was one of the decision-makers in the meeting where Vinarov was selected to be terminated pursuant to the 2002 ISP.[88] Not surprisingly, Vinarov did not remember the precise number of times Ten Brook called

---

[85]*Hemsworth, II,* 476 F.3d at 491.

[86]*Id.*

[87]*See Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 841 (7th Cir. 1996).

[88]Deposition of Keith Ten Brook, September 26, 2006, p. 103, Appendix to Plaintiff's Motion for Summary Judgment, Tab D.

him an "old fart" in his eight year tenure with Motorola.[89] But Motorola argues because the times Vinarov remembered being called an "old fart" did not occur around the time of the actual decision to terminate Vinarov (which occurred in August or September of 2002), they cannot be direct evidence of intent to discriminate. Contrary to Motorola's argument, however, the Court is not limited to consideration of only those three specific instances. At summary judgment the court must not only examine the individual pieces of evidence, but must view the whole picture that can be constructed from all of those pieces.[90] So how close the remarks were to the actual decision to terminate Vinarov and who made the remarks are simply "pieces of evidence that inform whether there was a 'mosaic of discrimination.'"[91]

Vinarov remembered being called "old fart" when Ten Brook was *notifying* Vinarov of his termination. Though this statement was not made "contemporaneous with" the decision to terminate him from Motorola (because that decision was made in a private meeting between managers), the timing of this "old fart" statement supports an inference that Vinarov's termination was related to his age.[92] This is distinguishable from cases cited by Motorola, where only one or two particular statements were made by the decisionmaker and the analysis turned on the precise timing of the statements. For example, in *Hoffman v. MCA, Inc.*, the court found the supervisor's comments that

---

[89]Deposition of Valery Vinarov, August 7, 2006, p. 31, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[90]*See Paz v. Wauconda Healthcare and Rehabilitation Centre, LLC,* 464 F.3d 659, 666 (7th Cir. 2006).

[91]*Paz,* 464 F.3d at 666.

[92]Deposition of Keith Ten Brook, September 26, 2006, p. 98, Appendix to Plaintiff's Motion for Summary Judgment, Tab D; Deposition of Valery Vinarov, August 7, 2006, pp. 75-76, Appendix to Plaintiff's Motion for Summary Judgment, Tab C; *See Conley v. Village of Bedford Park,* 215 F.3d 703, 711 (7th Cir. 2000)(stating that to "rise to the level of direct evidence of discrimination ... 'isolated comments must be contemporaneous with the [adverse action].'").

the plaintiff was "getting old" and that the company needed "fresh legs" was not direct evidence that the plaintiff was terminated because of his age.[93]  Rather, the court held that as a whole the comments were more like "conversational jabs in a social setting" and noted that the "getting old" comments were made after the plaintiff had complained about some ache or pain.[94]  A similar analysis is found in *Schwietz v. Nicolet* where the court found that an "old fart" comment was not related to the decision to terminate the plaintiff because "'it appeared to have been made in the context of random office banter'" and was not temporally related to his termination.[95]  Here, Ten Brook did not appear to be making the old fart comments in only the context of office banter but, rather, as a common way of referring to Vinarov. Further, standing alone the old fart comments are not neutral but, rather, show an inference that Ten Brook generally thought of Vinarov as old. Thus, there is a nexus between the repeated old fart statements and Motorola's decision to terminate Vinarov.  The series of remarks throughout his time at Motorola *and* the timing of Ten Brook's old fart comment (which was actually "old stupid fart" according to Vinarov), when he told Vinarov that after eight years of working with Motorola he was losing his job, is sufficient circumstantial evidence of intentional discrimination.  In other words, the Court finds that Vinarov has sufficiently put forward circumstantial evidence amounting to a "'convincing mosaic ... that allows a jury to infer intentional discrimination by the decision-maker.'"[96]

---

[93]144 F.3d at 1122.

[94]*Id.*

[95]2000 WL 1038123, *3 (N.D. Ill.)(*citing Robin v. Espo Eng'g corp.,* 200 F.3d 1081, 1089 (7th Cir. 2000))**.**

[96]*Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004)(*quoting Troupe,* 20 F.3d at737; *See also Huff v. UARCO, Inc.,* 122 F.3d 374, 380 (7th Cir. 1997)(finding that circumstantial evidence may be "suspicious timing, ambiguous statements," or generally evidence from which an inference of discriminatory intent might be drawn).

No inference of national origin or religious discrimination, however, can be drawn from the fact that Ten Brook referred to several meetings as "come to Jesus meetings" or from Ten Brook's "mad Russian bulldog" statements. Vinarov must show that these statements were somehow related to the employment decision, which he has not done. The remarks, standing alone or in the context of Vinarov's employment with Motorola, are not expressions of animus against him.

The fact that Ten Brook called certain meetings "come to Jesus meetings" has no relation to Vinarov whatsoever. Vinarov attempts to point to one of the meetings, which occurred sometime in 1997 or 1998, as evidence of discrimination because Ten Brook scolded Vinarov, albeit somewhat sternly, for hiring an Israeli employee, commenting on how he walked and how he talked. Vinarov took this to mean Ten Brook was making a statement about the employee being Jewish.[97] Though these remarks by Ten Brook may show an inference for his dislike of that particular employee, his statements about an employee that Vinarov hired, five years before Vinarov was terminated, does not support an inference of discrimination here. Further, Vinarov could not remember any occasion when Ten Brook actually used the "mad Russian bulldog" statements, just the fact that he had used it several times. These remarks simply do not give rise to an inference of discrimination on the basis of religion or national origin and are insufficient to defeat summary judgment because there is no foundation for the allegations. Vinarov does not know in what context Ten Brook called him a "mad Russian bulldog" and fails to explain how Ten Brook calling "come to Jesus meetings" was discriminatory intent to terminate him from his position with Motorola. Vinarov, put simply, fails

---

[97]Deposition of Valery Vinarov, August 7, 2006, p. 154, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

to establish the necessary nexus.[98]

Vinarov also relies on two letters of recommendation to support his position that Motorola had no reason to rate him "least effective" and that choosing him for the 2002 ISP was, indeed, evidence of discrimination. The Court can hardly rely on these letters of recommendation, however, as proof that Vinarov did not somehow deserve his rating of "least effective." It is well known that employers often write letters of recommendations highlighting an employee's best skills and characteristics, and such does not support Vinarov's position that Motorola lied about its decision to rate him "least effective." It may simply support, as Motorola argues, that Vinarov was the least effective out of a subset of exceptional employees.

Viewing the evidence as a whole, there is not enough evidence to support Vinarov's theory that his termination was a result of religious or national origin discrimination. Vinarov's reference to comments by some of his coworkers that he was doing a good job is not relevant here. Specifically, Vinarov points to a comment by Luz that did not think Vinarov was having problems. This, alone, does not show that his rating of "least effective" was somehow based on discriminatory intent.[99] Ten Brook was charged with the responsibility of monitoring and evaluating Vinarov's work performance; not his coworkers.[100] Vinarov further claims he did not receive a bonus due to his religion and national origin, but two of his colleagues, that he knows to be Jewish, did receive

---

[98]*See Fuka v. Thomson Consumer Elec.,* 82 F.3d 1397, 1403-04 (7th Cir. 1996)(holding that a plaintiff must establish a "nexus" between the allegedly discriminatory statements and the adverse employment decision).

[99]*See Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1056 (7th Cir. 2006)(finding that the fact that plaintiff's coworkers thought he was doing a good job was "beside the point.").

[100]*See Luks,* 467 F.3d at 1056 (noting that the coworkers were not the ones charged with the responsibility of monitoring and evaluating the plaintiff's performance, thus, their comments were not persuasive).

bonuses in 2002.[101] As for Ten Brook's reference to Israeli engineers as "these people" and his statement that Motorola was an "all-American company," these remarks were too removed from Motorola's decision to terminate him to be even remotely probative of discriminatory intent. In essence, there is nothing to support an inference that Motorola "'would not have taken adverse action against [Vinarov] had [he] not been [Jewish or Russian] ... and everything else had remained the same.'"[102] Vinarov has failed to show that his religion or national origin had anything to do with Motorola's decision to choose him for the ISP and has not shown how, in any way, that he was treated differently than any other employee.

The Court also considers Vinarov's proposed statistical evidence. To be considered relevant, statistics "'must look at the same part of the company where the plaintiff worked; include only other employees who were similarly situated with respect to performance, qualifications, and conduct; the plaintiff and the other similarly situated employees must have shared a common supervisor; and treatment of the other employees must have occurred during the same RIF as when the plaintiff was

discharged.'"[103] Vinarov's proposed statistical evidence provides that the reduction in 2002-2003 was only 13% and that 64% of the NAT employees fired during that time were over the age of 40. This is the relevant time period for purposes of this case. Vinarov also discusses the retained project managers being under 40 years of age and how they were similarly situated because they shared the same supervisor, Ten Brook, and worked in the NAT department with Vinarov.

---

[101]PR ¶ 87.

[102]*Robin,* 23 F.Supp.2d at 905 (*quoting Leffel v. Valley Fin. Serv.,* 113 F.3d 787, 792 (7th Cir. 1997).

[103]*Hemsworth, II,* 476 F.3d at 491-92(*quoting Balderston v. Fairbanks Morse Engine Div. Of Coltec Indus.,* 328 F.3d 309, 320 (7th Cir. 2003).

Vinarov fails to establish, however, the necessary context for a full meaningful comparison. Vinarov includes in his statistical analysis the decline in the NAT population from 1999 to 2002, which is irrelevant to this analysis because only the reduction in 2002 may be considered.[104] Vinarov further does not explain how those employees included in his analysis were similarly situated with respect to performance requirements, qualifications, and conduct. Vinarov merely asserts that, indeed, they were. The charts provided do not indicate what the employee's qualifications were or how Motorola documented their conduct.[105] Motorola claims Vinarov's statistics improperly include retirees, those employees who "self identified" to participate in the reduction in force, and employees terminated who were *not* selected by Ten Brook to be terminated but, rather, were selected by another manager (specifically 59 employees on Vinarov's list). According to Vinarov, eliminating those categorized employees from the calculation would make a minimal difference in the total numbers, but he offers no further explanation or proof for this statement. Vinarov also argues Motorola has failed to support its position that any of the employees included were even retirees or "self-identified," because Motorola never produced any documents to support such a notion. With these discrepancies, Vinarov's statistical analysis must be rejected for purposes of his motion because it does not support the proposition that only age, and not other nondiscriminatory factors, entered into the decision to terminate him.[106]

It is unnecessary to address the *McDonnell Douglas* burden shifting method of proof because Vinarov adequately supported his age discrimination claim under the direct method of proof

---

[104]*Hemsworth, II,* 476 F.3d at 491-92.

[105]PRDSAF ¶ 4.

[106]*See Barricks v. Eli Lilly and Co.,* 481 F.3d 556, 559 (7th Cir. 2007)(stating "[w]e have frequently discussed the dangers of relying on raw data without further analysis or context in employment discrimination disputes.").

and failed to proffer an argument under the indirect method as to his religious and national origin discrimination claims, and the Court will not do so for him.[107] The Court, therefore, denies summary judgment as to Count I and enters summary judgment in favor of Motorola as to Count II.

## II.    Count III - Failure to Pay Overtime

Vinarov claims Motorola failed to pay him overtime from 1995 to 1999, under both a discrimination and a breach of contract theory. Vinarov asserts Motorola discriminated against him on the basis of his age, religion, and national origin by paying overtime to other employees who were younger, non-Jewish, and/or non-Russian, but not to him. Vinarov also claims that Motorola breached his employment contract when it failed to pay him overtime.

Under the breach of contract theory, Motorola argues Vinarov's claim is time-barred because he filed his complaint on April 8, 2005 and there is no evidence Vinarov saw a policy or agreement relating to overtime pay while he was employed at Motorola. Vinarov claims he saw a PowerPoint presentation relative to the overtime policy, but no formal document, and simply contends someone promised him overtime (though he cannot specify who did so).[108]  Motorola asserts the five-year limitations period is applicable because a provision in the Illinois Code of Civil Procedure provides that "actions on unwritten contracts, express or implied ...and all civil actions not otherwise provided for, shall be commended within 5 years next after the cause of action accrued."[109]  Motorola, however, submits there was a corporate overtime policy that could have potentially applied to

---

[107]*See Doherty v. City of Chicago,* 75 F.3d 318, (7th Cir. 1996)(finding that "[g]iven our adversary system of litigation, '[i]t is not the role of this court to research and construct the legal arguments open to parties, especially when they are represented by counsel'" *quoting Sanchez v. Miller,* 792 F.2d 694, 703 (7th Cir. 1986)).

[108]Deposition of Valery Vinarov, August 7, 2006, pp. 205-06, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[109]735 ILCS 5/13-205.

Vinarov, which provided that "[o]rganizations may determine it is appropriate to pay for extensive overtime, provided that such time is scheduled and approved by management in advance."[110] The PowerPoint presentation Vinarov saw also provided that an employee, to be paid any overtime, had to receive pre-approval by management.[111]

Vinarov indeed requested overtime but admits he did not receive approval for overtime pay.[112] Despite Vinarov's failure to respond to this portion of Motorola's motion, the Court agrees that Vinarov cannot sustain his breach of contract claim as a matter of law. Even if the overtime policy applied to Vinarov, and we are not sure that it does, nor does Vinarov himself assert that it does, the terms of the policy resolve the issue in Motorola's favor. Pre-approval was required, in both the written policy and the PowerPoint, and Vinarov admits he never received approval for any overtime.

We next review Vinarov's discrimination claim. Motorola submits a one sentence argument that because Vinarov failed to mention his failure to pay overtime claim in his administrative charge of discrimination, that claim cannot move forward here. We look to *Rush v. McDonald's Corp*., for guidance.[113] There, the court held certain claims were not preserved because they were not properly presented to the EEOC.[114] The court found it was not sufficient for the plaintiff to file a general charge with the EEOC and then expect that allegation would permit all claims in the subsequent

---

[110]PR ¶ 21.

[111]Plaintiff's Appendix to Memorandum in Opposition to Defendant's Motion for Summary Judgment, Tab GG.

[112]PR ¶ 21.

[113]966 F.2d 1104, 1111 (7th Cir. 1992).

[114]*Rush,* 966 F.2d at 1112.

lawsuit.[115]  The court, however, also noted the general rule that to effectuate the remedial purposes of Title VII, the standard must be a liberal one.[116]  Here, Vinarov did, in fact, fail to specify his claim for overtime as part of his discrimination allegations before the EEOC.  Nevertheless, when claims that were not identified in the EEOC charge are "closely linked" to the discriminatory policies complained of, the court will uphold the plaintiff's right to pursue these latter charges.[117]  Because "[a]ll claims of discrimination are cognizable that are 'likely or reasonably related to the allegations of the charge and growing out of such allegations,'" we decline to dismiss this claim simply due to Vinarov's failure to include such in his EEOC charge.[118]

The Court next reviews Vinarov's discrimination claim as above, under the *McDonnell Douglas* burden-shifting framework. Even if the Court assumes Vinarov is a member of the protected class, met Motorola's legitimate expectations, and was indeed subject to an adverse employment action due to Motorola's failure to pay overtime, which the Court has already found was not the case, Vinarov fails at this point in the analysis. At this step, the Court must consider whether Motorola treated similarly situated employees outside the protected class more favorably. The "similarly situated" test is designed "to determine whether there are enough common factors between a plaintiff and a comparator-and a few enough con-founding ones-to allow for a meaningful comparison in order to divine whether discrimination was at play."[119] Vinarov must demonstrate that

---

[115]*Id.*

[116]*Id.* at 1111.

[117]*Id.*

[118]*Id.*(*quoting Jenkins v. Blue Cross Mut. Hosp. Ins., Inc.,* 538 F.2d 164, 167 (7 Cir. 1976).

[119]*Barricks,* 481 F.3d at 560.

"there is someone directly comparable in all material respects."[120]

Vinarov failed to do so. In response to Motorola's motion for summary judgment, Vinarov makes no attempt to point to a younger employee, a Jewish employee, or an employee of Russian origin, who was similarly situated and received more favorable treatment. It is clear from Vinarov's deposition testimony that he indeed believes the other engineers and developers he worked with received overtime pay and were under 40 years old.[121] However, Vinarov does not attempt to show even one directly comparable individual who received overtime pay. Without more, there can be no meaningful comparison to determine if discrimination was indeed at play. The Court, therefore, does not need to further analyze whether Motorola's stated reason for not paying Vinarov overtime was pretextual.

## III.     Count IV - Unjust Enrichment

Vinarov submits that he should be awarded damages because Motorola was unjustly enriched due to the work he did on a project known as "Project Edelweiss" in 2002 and 2003.[122] Project Edelweiss involved contacts with the Russian government that Vinarov helped to initiate, the goal of which was to do business with a Russian enterprise to provide telecommunication services.[123] Vinarov claims the work on that project was separate from his work as Project Manager, the position for which he was originally hired, and he understood that he would receive separate compensation for any work he did on the project. Specifically, Vinarov thought Project Edelweiss would result in

---

[120]*Id.*

[121]Deposition of Valery Vinarov, August 7, 2006, p. 96, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

[122] PR ¶ 92.

[123] PR ¶ 89-90.

his receipt of four to nine percent of an estimated 32 billion in gross sales, though Vinarov believes

Motorola has received around three billion dollars for its involvement in the project so far.[124]

"Unjust enrichment is a quasi-contractual theory of recovery."[125] The essential elements of

a claim for unjust enrichment include plaintiff conferring a benefit on defendant, defendant

accepting that benefit, and circumstances where defendant's retention of the benefit "violates

fundamental principles of justice, equity, and good conscience."[126] In Illinois, when a contract

governs the relationship between the parties, a plaintiff may not state a claim for unjust

enrichment.[127]

In this case, Vinarov's employment contract clearly stated that in consideration for his salary,

he agreed to "assign to Motorola ... title and interest in all [his] ... ideas developed or conceived by

[him] solely, or jointly with others, at any time during the term of [his] employment..." The fact that

the employment agreement between Vinarov and Motorola did not explicitly provide for

development of an international business plan in Russia does not allow Vinarov to now invoke a

quasi-contract remedy.[128] Vinarov argues he was only hired as a Project Manager and, therefore,

his salary only covered the work he did pursuant to that particular position. However, in signing his

employment agreement with Motorola, Vinarov agreed to accept a fixed salary in exchange for "the

entire right, title and interest in all [his] inventions, innovations, or ideas developed" during his

tenure with the company. As noted by Motorola, *Murray v. ABT Associates, Inc.,* supports this

---

[124]PR ¶ ¶ 89, 98.

[125]*First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir. 1985).

[126]*Johnson v. Gudmundsson,* 35 F.3d 1104, 1114 (7th Cir. 1994).

[127]*First Commodity Traders, Inc.,* 766 F.2d at 1011.

[128]*See id.* (stating that the simply because the agreement between the two parties did not explicitly provide for allocation of customers or commissions did not allow plaintiff to invoke a quasi-contract remedy).

position.[129] In that case the defendant hired the plaintiff for a fixed salary and for a fixed two year term.[130] After being discharged, the plaintiff filed suit claiming unjust enrichment.[131]  The court found the plaintiff "received his due under the contract," because the defendant honored the parties' agreement.[132]  The court further held that simply because the business was lucrative, the plaintiff could not demand more than the agreed upon salary.[133]

Here, the circumstances are similar.  Vinarov refers the Court to the deposition testimony of several Motorola employees who confirm that the project Vinarov describes indeed was put in place in Russia and that Vinarov put together a business plan for the project.[134]  Vinarov also points to his primary contact in Russia, Valentin Lazutkin, and various press releases that confirm his role in working with Motorola in Russia.  Vinarov then submits that he had conversations with Claude Margerel, Motorola's Director of Strategy for Russia, discussing the possibility of an agreement entitling him to a certain percentage of any sales in Russia, though no agreement was ever formalized.[135]  These conversations, however, do not change Vinarov's ability to collect damages. "Illinois permits parties to agree to negotiate, and to work toward some goal, without committing

[129]18 F.3d 1376, 1377 (7th Cir. 1994).

[130]*Murray,* 18 F.3d at 1377.

[131]*Id.* at 1378.

[132]*Id.*

[133]*Id.* at 1379.

[134]*See* Deposition of Robert J. McCall, December 20, 2006, p. 47, Plaintiff's Appendix to Memorandum in Opposition to Defendant's Motion for Summary Judgment, Tab Y.

[135]Deposition of Valery Vinarov, August 7, 2006, pp. 242-44, Appendix to Plaintiff's Motion for Summary Judgment, Tab C.

themselves to its achievement - or to pay damages if it is not achieved."[136]  Further, none of the submissions made by Vinarov change the fact that Vinarov had an employment agreement, which prohibits him, here, from recovery on a theory of quasi-contract.[137]

## CONCLUSION

For the foregoing reasons, the Court denies Vinarov's motion for summary judgment in its entirety (dkt 103). Motorola's motion for summary judgment is denied as to Count I and granted as to Counts II-IV (dkt 122).  Vinarov's claim that he was terminated in violation of the ADEA remains for trial. The Court denies Motorola's motion for Rule 11 sanctions (dkt 133) and deems Vinarov's motion for leave to file an amended declaration in opposition to Motorola's motion for summary judgment as moot (dkt 149).  The Court will confer with the parties in the near future to schedule a trial date.

**IT IS SO ORDERED**

**ENTERED: <u>March 26, 2008</u>**

UNITED STATES MAGISTRATE JUDGE

---

[136]*Murray,* 18 F.3d at 1378.

[137]*Id.* at 1379(stating the principal that "Illinois does not permit recovery on a theory of quasi-contract when a real contract governs the parties' relations.").